IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RONALD BARROW,                 ) | |
|                       ) | |
|           Plaintiff,       ) | |
|                       ) | |
| vs.                         ) | Case No. 3:14-CV-800-NJR-DGW |
|                       ) | |
| WEXFORD HEALTH SOURCES, INC.,   ) | |
| DR. ROBERT SHEARING, and DR.    ) | |
| J. TROST,                  ) | |
|                       ) | |
|           Defendants.     ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Ronald Barrow initiated this civil rights action, pursuant to 42 U.S.C. § 1983, on July 11, 2014 (Doc. 1). Now pending before the Court is the Motion for Summary Judgment filed by Defendants Wexford Health Sources, Inc., Dr. Robert Shearing, and Dr. John Trost on July 15, 2016 (Doc. 176). Barrow filed a response on October 11, 2016 (Doc. 195), supplemented by several exhibits (Docs. 200, 208). For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff Ronald Barrow, an inmate incarcerated at Menard Correctional Center, suffers from various chronic conditions including hemorrhoids, rectal bleeding, chronic knee and shoulder pain, lower back pain, GERD (gastroesophageal reflux disease),

diverticulosis,[1] and eye conditions (Doc. 177-1, pp. 1-2; Doc. 177-3, pp. 1-2). Barrow is proceeding on his Third Amended Complaint (Doc. 30), filed on October 8, 2014, which alleges that Defendants were deliberately indifferent to his chronic medical conditions in violation of the Eighth Amendment. Specifically, after threshold review pursuant to 28 U.S.C. § 1915A, Barrow was permitted to proceed on the following claims:

Count 1:    Eighth Amendment deliberate indifference to medical needs claim against Wexford based on a policy, custom, or practice of elevating "cost over care;"

Count 2:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Wexford, Shearing, and Trost for denying Plaintiff access to prescription medications;

Count 3:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Wexford, Shearing, and Trost for denying Plaintiff adequate treatment for his chronic back injury;

Count 4:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Wexford, Shearing, and Trost for denying Plaintiff adequate treatment for his chronic rectal bleeding and diverticulosis;

Count 5:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Wexford, Shearing, and Trost for denying Plaintiff adequate treatment for his chronic knee problem; and

Count 6:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Wexford, Shearing, and Trost for his shoulder problem.[2]

---

[1] Having numerous inflamed diverticula, "pouch or sac openings" in the gut or colon, that are filled with "stagnant fecal material and become inflamed" and that "rarely" may "cause obstruction, perforation, or bleeding." STEDMAN'S MEDICAL DICTIONARY 575 (28th ed. 2006).
[2] Barrow's claims against Kimberly Butler and Gail Walls were dismissed on November 14, 2016 (Doc. 209).

The following facts are undisputed except where noted.[3]

## A.   Dr. Robert Shearing

During the relevant time period, Barrow was incarcerated at Menard and was treated by Dr. Robert Shearing, who was employed by Wexford as the medical director from October 15, 2012 to November 16, 2013 (Doc. 177-1, p. 4). In a November 19, 2012 letter, Barrow introduced his medical conditions to Dr. Shearing, claiming that he had chronic back pain, loss of vision, diverticulosis (for which his prescription of Metamucil was switched to Konsyl, which was ineffective), chronic shoulder pain, chronic GERD, and a few other medical issues (Doc. 200, pp. 25-31). Prior to his interaction with Dr. Shearing, Barrow had been prescribed Tramadol, a generic for the narcotic Ultram,[4] for his lower back pain and Prilosec for GERD.[5]

Dr. Shearing first saw Barrow on November 20, 2012 (Doc. 177-2, p. 2; Doc. 177-1). At that examination, Dr. Shearing reduced Barrow's Tramadol doses in an effort to wean him off that medication (Doc. 177-1, p. 2). Dr. Shearing's reason for discontinuing Barrow's "high dose" of Tramadol was that, "when used on a chronic basis, [it] tends to produce problems with tolerance, dependence and addiction" (Doc. 177-1, p. 2).

---

[3] Barrow appears to dispute every fact Defendants presented. The Court declines to address each dispute and will only highlight genuine issues of material fact. Barrow also has presented a substantial amount of documents, some of which are irrelevant. They also will not be addressed.

[4] "Tramadol is used to relieve moderate to moderately severe pain. Tramadol extended-release tablets and capsules are only used by people who are expected to need medication to relieve pain around-the-clock. Tramadol is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain." Tramadol may be habit-forming and doses should be reduced gradually because suddenly stopping the medication can cause adverse effects. Medline Plus, *Tramadol*, https://medlineplus.gov/druginfo/meds/a695011.html#why (last visited February 1, 2017).

[5] Prilosec is the brand name of Omeprazole which is used to treat GERD, "a condition in which backward flow of acid from the stomach causes heartburn and possible injury to the esophagus (the tube between the throat and stomach)." Medline Plus, *Omeprazole*, https://medlineplus.gov/druginfo/meds/a693050.html (last visited February 1, 2017).

Furthermore, "over the long term, it would require ever increasing doses, eventually to the point where the risks of life-threatening respiratory depression, among other things, would become prohibitively high in order to have any pain reducing effect at all" (*Id.*). Dr. Shearing instead prescribed Amitriptyline, a non-narcotic prescribed to treat chronic pain without the adverse side effects associated with Tramadol (Doc. 177-1, p. 2). It is unclear from the record whether Barrow was, in fact, addicted to or dependent on Tramadol, or whether tolerance to the medication required Barrow to take a higher dose.

On November 27, 2012, Barrow wrote to Dr. Shearing stating that he was in "extreme pain" and "unable to function like I was while on Ultram" (Doc. 200, p. 76). Barrow claimed the Amitriptyline did nothing to help with his pain and caused him unnecessary suffering. Barrow also referenced his chronic knee and shoulder pain and stated that, without Ultram, his severe pain and stiffness were worse than ever. Barrow further stated that the switch from Metamucil to Konsyl was not working, and he had continued rectal bleeding and constipation.

Dr. Shearing next reviewed Barrow's chart on December 10, 2012, but made no changes to his medication (*Id.*). Barrow wrote additional letters to Dr. Shearing on December 11, 2012, December 20, 2012, January 6, 2013, January 13, 2013, and February 6, 2013, making the same complaints about the switch in his medications, the ineffectiveness of Amitriptyline and Konsyl, and his ongoing severe pain and suffering (Doc. 200, pp. 80-95).

On February 20, 2013, Barrow's prescription for Amitriptyline ran out and was not refilled. On March 7, 2013, Barrow sent a letter to Dr. Shearing in which he claimed a

previous MRI showed a bulging disc for which he received steroid injections and Ultram (i.e., Tramadol) (Doc. 200-1, p. 28). Barrow also claimed that his prescription for Konsyl (also known as Fibercon) was not refilled for more than five weeks, and that Dr. Shearing allowed both his Ultram and Amitriptyline to run out without weaning him off the medications. He further stated that his knee pain was limiting his activity and that prior testing showed "spurring behind the knee cap" (*Id*. p. 30). He claimed the discontinuation of his pain medication "result[ed] in my daily pain and suffering from back, knee, and shoulder, negatively impacting my daily activity, sleep and quality of life" (Doc. 200, p. 9).

Dr. Shearing saw Barrow on March 13, 2013, but did not renew the prescription for Amitriptyline, and no further pain medications were ordered. Dr. Shearing did change Barrow's Prilosec prescription to Protonix "due to a change in the formulary" (*Id.).* Dr. Shearing indicates that both Prilosec and Protonix are "functionally equivalent" proton pump inhibitors that "decrease the amount of acid produced in the stomach" and are "appropriate to treat symptoms of excess acid production and GERD" (*Id.*, pp. 2-3). Dr. Shearing states in his affidavit that while there are situations when ordering a non-formulary medication is appropriate, there was no medical reason to do so in this instance (*Id.*).

When Dr. Shearing saw Barrow again on July 16, 2013, to follow up on claims of blood in his stool (which Barrow had conveyed to a nurse on July 8, 2013) and chronic

back pain, he reviewed the physical examination done by a nurse on May 30, 2013,[6] and ordered blood work (*Id*. p. 3). Dr. Shearing subsequently prescribed Fibercon and instructed Barrow to continue Protonix for his GERD (*Id*. pp. 3-4). In his affidavit, Barrow claims that these medications were ineffective, but he does not elaborate in what manner they did not work. As for Barrow's back pain, Dr. Shearing performed physical tests, which revealed that Barrow suffered from a chronic condition with no acute cause. Accordingly, no additional diagnostic testing such as an MRI or further pain management was necessary (*Id*.). Dr. Shearing did not see Barrow again; however, he did renew his medications (Protonix, Fibercon, and artificial tears) on August 28, 2013 (*Id*.).

Throughout the year that Barrow saw Dr. Shearing for treatment, Barrow sent ten letters to the doctor (Doc. 200, p. 42). At the heart of Barrow's many letters is his belief that Dr. Shearing changed his medications to prescriptions that were ineffective, that he was not ordering diagnostic testing of his back problems, that he did not ensure Barrow was in fact receiving his medications without delay or breaks, and that he discontinued pain medication notwithstanding the continuation of Barrow's chronic pain. For example, Barrow generally complained that the Protonix, Fibercon, and Amitriptyline

---

[6] On May 30, 2013, a nurse noted a normal rectal exam (Doc. 200-1, p. 38). Barrow's stool was examined on July 3, 2013 and found to contain "Occult Blood positive x3" (Doc. 200-1, p. 37). This term refers to blood "in the feces in amounts too small to be seen but detectable by chemical tests." STEDMAN'S MEDICAL DICTIONARY 231 (28th ed. 2006). He then was seen by a nurse and complained of bright red bleeding with bowel movements on July 7, 2013 (Doc. 200-1, p. 34). When Dr. Shearing saw him on July 16, 2013, and reviewed lab work, his stool was found to be without blood (Doc. 177-1, p. 3). But, because of chronic constipation and his history, Barrow was prescribed Fibercon, a fiber supplement, and continued with the Protonix because of his history of GERD (*Id*. p. 4). Thus, notwithstanding Barrow's belief, as outlined in his affidavit, there were no clinical findings that he had rectal bleeding observable to the naked eye (*See* Doc. 200, p. 12).

were either not working or were not working as well as Prilosec, Metamucil, and Tramadol to control his GERD, diverticulosis, and chronic pain in Barrow's back, shoulder, and knee. Barrow also claimed that dosing changes were reducing the efficacy of the drugs and that various medications were not refilled prior to them running out, which left him without medication for days (*See generally*, Doc. 200, pp. 25-31, 76-95; Doc. 200-1, pp. 27-32, 39).

Dr. Shearing responded twice to Barrow's letters, once around December 11, 2012, and the next on February 18, 2013. In these letters, Dr. Shearing stated, in relevant part, that Tramadol/Ultram for chronic low-back pain was not used at Menard any longer because it is not an "evidence-based practice" and that after Barrow's long-term use, weaning him off the medication rather than discontinuing it immediately (what they were doing) was best. Dr. Shearing also said that Konsyl/Fibercon and Metamucil have the "same exact effective ingredient" with no difference in effectiveness. Dr. Shearing noted that Barrow's knee x-ray showed only "very minimal early degenerative changes which has not progressed," and that should not substantially limit his activity. Dr. Shearing further told Barrow that his spinal x-rays showed minimal degenerative changes, there was nothing unusual about his spine or back pain, and if he was not receiving his medication on time he should put in a nurse sick call (Doc. 200, p. 83; Doc. 200-1, p. 22).

**B.     Dr. John Trost**

Dr. John Trost has been employed by Wexford as the medical director of Menard since November 25, 2013 (Doc. 177-3, p. 1). In a February 24, 2014 letter, Barrow

introduced himself to Dr. Trost and requested to be seen to discuss his health conditions, including back pain, loss of vision, GERD, diverticulosis, and rectal bleeding (Doc. 200, p. 41). Barrow also said Dr. Shearing discontinued or denied certain treatments and listed his medical conditions, but he did not request any particular relief. Dr. Trost's notes from a subsequent appointment, as well as Dr. Trost's affidavit, reveal that he switched Barrow back to Prilosec for GERD and reordered Konsyl/Fibercon, but he did not make any notation about Barrow's pain (Doc. 177-2, p. 6; Doc. 177-3, p. 2). Dr. Trost states that Barrow did not complain about pain (Doc. 177-3, p. 2), while Barrow claims that the visit was rushed and he only had a few minutes to talk about his issues (Doc. 200, p. 14).

Barrow wrote a follow up letter on April 7, 2014, discussing the "disc damage" in his back and requesting an MRI and pain medication. He also said he did not receive all medications prescribed for GERD/diverticulosis (Doc. 200-1, p. 65-67). Barrow further submitted sick call and prescription refill requests in July, August, and September 2014 (Doc. 200-1, pp. 71-73). In his affidavit, Barrow stated he suffered from rectal bleeding as a result of being prescribed Konsyl/Fibercon and not Metamucil (Doc. 200, p. 14).

On September 29, 2014, Dr. Trost evaluated Barrow for low back pain after Barrow complained about it in a September 2014 letter (Doc. 200-1, p. 73) and during a visit to the nurse on September 12, 2014 (Doc. 177-3, p. 2). After reviewing Barrow's medical history, his normal physical examination on July 16, 2013, a lack of radiating pain, and the fact that Barrow had not been on pain medication for nineteen months, Dr.

Trost ordered Tylenol 500 mg for the "exacerbation of his chronic back pain" for a three-month period (Doc. 177-3, p. 3).

Barrow wrote five more letters dated October 30, 2014, November 4, 2014, January 13, 2015, January 13, 2015, and February 1, 2015 (Doc. 200-2, pp. 1, 2, 67; Doc. 177-4, pp. 1-2; Doc. 177-5) addressed either to Dr. Trost or the health care unit. In these letters, some of which are difficult to read, Barrow mentions his back pain, his desire for an MRI, the fact that he is not receiving his Tylenol, and that, by January 2015, his Tylenol prescription ran out.

During this letter writing campaign, there were no medical records showing that Barrow complained about back pain during nurse sick call (Doc. 200-2, p. 65). Nonetheless, Dr. Trost renewed Barrow's Tylenol prescription on February 15, 2015, and his Fibercon prescription on March 9, 2015 (Docs. 177-2, pp. 11-12). The Tylenol was again renewed on May 12, 2015 (Doc. 177-2, p. 14).

Barrow's letter writing continued. In a June 14, 2015 letter, Barrow indicated that his rectal bleeding was persistent, that the Tylenol prescribed for headaches and back pain was not working, and that his GERD medication was not working (Doc. 200-2, pp. 5-6). On June 25, 2015, Barrow explained that he slipped and fell, causing severe pain and trouble breathing. He put in for a sick call request but claims he was not adequately treated, only having received 325 mg of Tylenol and not his prescription for 500 mg of Tylenol (Doc. 200-2, p. 83-84). Barrow was seen by a non-defendant doctor on July 16, 2015, for his back pain; the doctor noted that Barrow said the Tylenol was not working,

but that he refused non-steroidal anti-inflammatory agents (NSAIDS).[7]  Barrow was told to continue taking Tylenol (Doc. 177-2, p. 18). In an October 1, 2015 letter, Barrow stated that pain medication for his back was not working (Doc. 200-2, p. 9). He further complained in an October 14, 2015 letter that prescription medications were not being refilled (Doc. 200-3, p. 3), although only a few weeks prior to that Dr. Trost renewed his prescriptions for Tylenol, Fibercon, and Zantac[8]  (Doc. 177-3, p. 5).

On December 17, 2015, Barrow was seen at nurse sick call for all the medical conditions outlined above, at which time he said he wanted to be seen by the doctor (Doc. 177-2, p. 22). After two appointments were rescheduled, first due to Dr. Trost being sick and then due to security issues, Barrow was seen on January 21, 2016 (Doc. 177-3, p. 6). Dr. Trost ordered Robaxin, a muscle relaxant, for back pain, Tylenol, Fibercon, and Zantac; he also ordered an x-ray of Barrow's lumbar spine (Doc. 177-2; 177-3, p. 6). The x-ray revealed "mild degenerative changes" (Doc. 177-2, p. 24). He then underwent a lumbar spine MRI on March 24, 2016 (Doc. 177-2, pp. 31-32). The test results revealed "minimal disc bulges (possibly physiologic) and minor facet anthropathy" and minimal or mild stenosis. These findings, which are consistent with simply getting older, did not compel Dr. Butaled (not a defendant in this case) to make any changes to Barrow's treatment (Doc. 177-2, p. 29; Doc. 177-3, p. 7).[9]

---

[7] Barrow disputes this fact, stating that he did not refuse an NSAID but rather informed the doctor that he has gastrointestinal problems from taking them (Doc. 200, p. 19).
[8] It is unclear when Zantac was first prescribed.
[9] The medical reports and Dr. Trost state that Barrow was seen by Dr. Butaled. Barrow disputes that he was seen or examined by Dr. Butaled on that date (Doc. 200, p. 19).

Dr. Trost avers that Barrow's back pain is of the type that can "wax and wane" over the course of years depending on "edema and inflammation irritating the nerves that run down his legs" (Doc. 177-3, p. 8). This is supported by Barrow's testimony and medical records that reveal Barrow's back pain went from a 3 on "good days" to a 9.[10] Dr. Trost believes that prior to January 21, 2016, Barrow had decreased inflammation and hence decreased pain; after that date, he went through a period of exacerbated pain which led to the ordering of diagnostic testing (Doc. 177-3, p. 8). Dr. Trost saw Barrow for the last time (before his June 21, 2016 deposition) on April 7, 2016 (Doc. 177-3, p. 7). At that time, no complaints were noted, and Barrow was directed to follow up as needed (Doc. 177-3, p. 7).

On September 26, 2016, Barrow was evaluated by an outside specialist, Dr. Criste Gerson, who diagnosed Lumbosacral spondylosis without myelopathy (Doc. 208, pp. 18-20). Dr. Gerson recommended a number of treatment options, including a single epidural or facet joint injection, or non-habit forming muscle relaxants such as cyclobenzaprine, tizanidine, or Robaxin. Dr. Gerson also noted that NSAIDS such as Celebrex or Meloxicam could be tried, with the use of Ultram for severe flare-ups (*Id.*).

## C.   Wexford Health Sources, Inc.

Defendants state that:

> Wexford has no policy, protocol, or practice, either written or unwritten, that medical providers are to refrain from treating inmates at outside

---

[10] For example, he states that on September 12, 2014, he told the nurse that his pain was constantly a 3 (on a 10-point scale) but that it becomes a 6 to 9 and wakes him up from his sleep (Doc. 200, p. 15). The actual nurse's note only indicates that his pain is a constant 3 (Doc. 177-2, p. 7). Barrow uses this entry an example of alleged inaccuracies in the medical record.

> facilities if the treatment is medically necessary, or that physicians are to put money at the forefront of medical decision making; there is no such thing as a 'cost over care policy.'

(Defendants' Statement of Undisputed Material Fact 36). To support this statement, Defendants rely on the affidavit of Joe Ebbitt, the Director of Risk Management, HIPAA Compliance, and Legal Affairs for Wexford Health Source, Inc. (Doc. 177-6, pp. 1-3). Barrow claims that this document was not produced in discovery in this case (Doc. 195-1, p. 14). Because Defendants are exempt from initial Rule 26(a) disclosures as set forth in Local Rule 26.1, Barrow should have, but has not, identified what discovery request would have resulted in the production of this document. Barrow also has not argued that Defendants failed to disclose Mr. Ebbitt's name as may have been required by the Scheduling Order (Doc. 52, p. 2). As such, the Court will consider the affidavit.[11]

---

[11] Barrow presents his own affidavit (Doc. 200-3, pp. 51-63), which he purportedly based on the statements of unknown doctors made at unknown times in an unrelated case (*see also* Doc. 200, p. 21).The information contained in Barrow's affidavit is not based on personal knowledge. First, the affidavit appears to explain the contract between the IDOC and Wexford. The contract speaks for itself and explanation is generally unnecessary. Second, Barrow makes arguments (i.e. "The contract between Wexford and IDOC is designed to provide an incentive to Wexford and to IDOC to limit access to care to prisoners" (Doc. 200-3, p. 54)) and not statements of fact. Finally, Barrow explains his "cost over care" theory: that "financial incentives were very likely a significant determining factor why the plaintiff was not provided timely specialty care of my serious medical needs" (Doc. 200-3, p. 55). This affidavit appears to be an improper attempt to submit expert opinion. The Court declines to parse the affidavit and determine which statements could possibly be based on personal knowledge. It is accordingly **STRICKEN** (Doc. 200-3, pp. 51-63).

      Throughout the affidavit in support of his claims (a separate affidavit from the stricken affidavit), Barrow states that various discovery has not been provided by Defendants (*See e.g.* Doc. 200, p. 21). Barrow has not filed a Rule 56(d) motion indicating that facts are unavailable (because of these alleged discovery violations) to justify his opposition to the motion for summary judgment. Barrow likewise has responded to the motion by providing numerous documents that may support his claims. Thus, Barrow's discovery related arguments, at this late stage of the proceedings, are insufficient to stay a ruling on Defendants' motion.

      Finally, on October 19, 2016 (Doc. 198), Defendants were directed to provide for *in camera* inspection various documents—the Wexford Provider Handbook (effective date July 8, 2015), Wexford Provider Handbook (effective date June 8, 2012), "Pain Management" guidance, GERD medication cost

In light of this evidence, Barrow must come forth with evidence to support his theory that such a policy exists. Barrow makes general claims that Wexford has a practice of taking cost into account when prescribing formulary over non-formulary medication and in following treatment protocols, that it has a policy of ignoring inmate correspondence, and that Wexford has a policy of not meeting the obligations of its contract with the Illinois Department of Corrections. To support this theory, Barrow relies solely on the evidence set forth above regarding his personal medical treatment.

## LEGAL STANDARD

The standard applied to summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel.*

---

chart and treatment protocol, and Orthopedic Surgery Guidelines—that have been produced in this matter pursuant to a Protective Order (which prevented Barrow from retaining a copy) and which Barrow states are relevant to this action. Barrow is familiar with these documents (*See* Doc. 194), and the Court will consider them.

*Nyman v. Winnebago Cty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *Greeno*, 414 F.3d at 653.

In order to show that prison officials acted with a sufficiently culpable state of mind, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.").

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would

have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain*, 512 F.3d at 894–95). *See also Holloway*, 700 F.3d at 1073 ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field.") (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008))).

## DISCUSSION

In Counts 2, 3, 4, 5, and 6, Barrow alleges that Defendants were deliberately indifferent to his health needs, in particular, his access to prescription medication, his back condition and pain, his diverticulosis/rectal bleeding, his knee condition and pain, and his shoulder condition and pain. Defendants do not dispute that Barrow suffers from objectively serious medical conditions. *See e.g. Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (finding that deliberately inadequate treatment causing severe pain presents an Eighth Amendment claim). Thus, the only question remaining is whether they were deliberately indifferent to those serious medical conditions.

To succeed on a claim of deliberate indifference, a plaintiff does not have to prove that his complaints of pain were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes* 546 F.3d at 524 (quoting *Sherrod*, 223 F.3d at 611). "Even if a defendant recognizes the substantial risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511

U.S. at 843). A plaintiff is not entitled to specific treatment, he cannot demand particular diagnostic tests, nor is he entitled to even "proper" treatment. *Jackson*, 541 F.3d at 697-698. Rather, doctors are afforded deference in their medical treatment, and plaintiffs are only entitled to medical treatment that is "based on professional judgment." *Zain v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016).

## A.    Dr. Shearing and Dr. Trost (Count 2)

In Count 2 of his Third Amended Complaint, Barrow alleges that Defendants failed to provide adequate medical treatment in reckless disregard of his need for the timely administration of prescribed medication. Specifically, Barrow claims Defendants knew that his health conditions posed a serious harm and caused unnecessary suffering if not properly and timely treated by medication. Barrow asserts that Defendants failed to follow his prescribed treatment plan and to take steps to ensure the treatment was properly provided by denying, delaying, or failing to deliver, refill, or renew his prescribed medication.

In their motion for summary judgment, Defendants argue generally that Dr. Shearing decided to wean Barrow off of Ultram/Tramadol and prescribe him Amitriptyline based on Dr. Shearing's education, training, and experience. They also claim that, as of his examination on July 16, 2013, Barrow's back pain was chronic in nature and no further testing or referral for pain management was necessary. Defendants make no argument or cite to any case law, however, with regard to Barrow's claim that refills of medications for his chronic lower back pain and diverticulosis were

denied or delayed, or that his medication was stopped abruptly. As such, Dr. Shearing is not entitled to summary judgment on Count 2.

With regard to Dr. Trost, Defendants claim that Dr. Trost ordered Prilosec and Fibercon for Barrow, and that Barrow's complaints regarding the non-renewal of his prescription for Tylenol were either moot because the prescriptions had already been refilled at the time Barrow wrote his letters, or premature because he had not presented to Nurse Sick Call to request renewal of his Tylenol prior to writing Dr. Trost. But Defendants do not address Barrow's unanswered letter of April 7, 2014, notifying Dr. Trost that he did not receive all of his prescribed medication for diverticulosis (Doc. 200-1, p. 65-67). Accordingly, Dr. Trost also is not entitled to summary judgment on Count 2.

## B.    Dr. Shearing (Counts 3, 4, 5, and 6)

In Counts 3 through 6,[12] Barrow alleges that Defendants were deliberately indifferent to his medical needs in that they denied him adequate treatment for his chronic back injury, chronic rectal bleeding and diverticulosis, chronic knee problem, and chronic shoulder problem.

With regard to Dr. Shearing, the evidence reveals that when Barrow first saw Dr. Shearing, he was on "high doses" of a narcotic pain reliever.[13]  Dr. Shearing switched the

---

[12] Because Defendants did not parse out the various conditions that Barrow complained of, which are listed as separate counts, in any meaningful manner, the Court also declines to do so.

[13] Dr. Shearing's arguments focus exclusively on Barrow's back pain and GERD. He makes no argument, nor does he present any facts related to Barrow's knee pain or shoulder pain, other than to claim he never saw Barrow for his knee or shoulder pain. This argument is refuted by Barrow's evidence of a letter written by Dr. Shearing to Barrow, in which he noted that Barrow's knee had only "minimal early degenerative change" that should not substantially limit his activity. Further, Barrow presented evidence

medication to a non-narcotic in an attempt to prevent addiction and tolerance issues. Barrow then complained that the new drug, Amitriptyline, was not effective. [14] Notwithstanding Barrow's complaints, no additional diagnostic testing was ordered, and he was not seen by the doctor, for a year. Barrow's prescription for pain medication also lapsed with no refills. Thus, while the switch to Amitriptyline may have been the result of professional judgment, the continuation with that course of treatment in the face of notifications that it was not working and was no longer available may compel a jury to find that Defendants recklessly disregarded Barrow's needs. *See Greeno*, 414 F.3d at 654 ("We think a factfinder could infer [deliberate indifference] from the medical defendants' obdurate refusal to alter Greeno's course of treatment despite his repeated reports that the medication was not working and his condition was getting worse."); *Kelley v. McGinnis*, 899 F.2d 612, 616-17 (7th Cir. 1990) (inmate may prevail if he can prove that defendant "deliberately gave him a certain kind of treatment knowing that it was ineffective"). A jury could likewise find, however, that pursuant to Dr. Shearing's subsequent physical exam showing no acute findings, four months after his pain medication ran out, that switching pain medication and then providing no further pain medication was based on medical judgment.

This same conclusion can be reached with Dr. Shearing's treatment of Barrow's diverticulosis and rectal bleeding. When Barrow complained that the switch from

---

that Tramadol was effective in combating his back pain in addition to his shoulder and knee pain. Defendants have not responded to this evidence by filing a reply brief.

[14] Barrow's evidence from this time period reveals that he was complaining of shoulder and knee pain that was resolved with the Tramadol but not the Amitriptyline. As such, his complaints of pain are related to Counts 3, 5, and 6.

Metamucil to Konsyl/Fibercon was not working effectively, his complaints resulted in no action. *See Greeno*, 414 F.3d at 654. A jury could find that failing to provide Barrow with medication that worked in favor of medication that was not effective in treating Barrow's diverticulosis and rectal bleeding was deliberate indifference.

Accordingly, Barrow shall be permitted to proceed on Counts 3, 4, 5, and 6 against Dr. Shearing.

## C.   Dr. Trost (Counts 3, 5, and 6)

Turning to Dr. Trost, Barrow's evidence consists mostly of various letters that he wrote to Dr. Trost or the healthcare unit, numbering in the dozens, about his medical conditions. There is no evidence that Barrow ever sought treatment from Dr. Trost for his shoulder or knee pain; indeed, these conditions are not listed in his February 24, 2014 introductory letter.

As for Barrow's back issues, Barrow saw Dr. Trost for the first time on February 28, 2014, and he briefly discussed his back pain with the doctor. There is no evidence that Barrow told Dr. Trost about his level of pain, however, or that he had severe back pain that necessitated pain medication or further treatment. The evidence shows that Barrow wrote two letters to Dr. Trost requesting an MRI, pain medication, and an evaluation of his back only after his pain was exacerbated by a "cloth mattress" and sitting bent over for a three-hour period (Doc. 200-1, p. 66). When Dr. Trost did see Barrow about his back pain in September 2014, Barrow had not been taking pain medication for months and previously had a normal physical examination (in 2013) with no evidence of radiating pain. Thus, Dr. Trost's prescription of Tylenol for the exacerbation of his back condition

at that time does not exhibit deliberate indifference. To the extent that Barrow argues that more should have been done, it is well established that whether or not to order diagnostic tests is within a doctor's medical judgment. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is 'a classic example of a matter for medical judgment.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

After Barrow's acute incident on June 25, 2015 (where he slipped and fell), he informed Dr. Trost, in October 2015, that the Tylenol was not effective. When Barrow saw Dr. Trost in January 2016 (after two rescheduled appointments), a muscle relaxant, x-ray, and a subsequent MRI were all ordered. These actions are consistent with the evidence that Barrow's back pain "waxes and wanes" and that diagnostic testing was now appropriate because of the flare-up in Barrow's back condition.

It should also be noted that prior to January 2016, two other doctors either saw Barrow or evaluated his back condition and did not make any changes to his pain medication. And Barrow's many letters to Dr. Trost did not provide sufficient information to inform him that Barrow's back pain was severe, worsening, exacerbated, or that he was having difficulty with activities of daily living. To the extent that Barrow argues that there was delay in the treatment of his back pain, there has been no showing that Dr. Trost was aware that the condition was severe enough to render immediate care. *See Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039-1040 (7th Cir. 2012) (noting that the length of delay should be evaluated with the seriousness of the condition in determining whether it constitutes deliberate indifference).

Based on this evidence, no reasonable jury would find that Dr. Trost was deliberately indifferent to Barrow's back condition or pain. Dr. Trost performed evaluations and tests, provided sufficient medication in light of Barrow's complaints, and otherwise used his medical judgment in treating Barrow. While there may have been some delay in treatment, there is no evidence that it was anything more than inadvertent, and there is certainly no evidence that Dr. Trost elected to treat Barrow's back condition in an obdurate manner. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (noting that "isolated instances of neglect" are probably insufficient to make out a deliberate indifference claim).

Dr. Trost is entitled to judgment on Counts 3, 5, and 6.

**D.     Dr. Trost (Count 4)**

Dr. Trost continued prescribing Konsyl/Fibercon for Barrow's rectal bleeding and diverticulitis throughout his treatment of Barrow, despite receiving a letter dated October 5, 2014, in which Barrow complained that Fibercon was not effective (Doc. 200-1, p. 77).[15] Barrow further provides evidence that on March 5, 2015, he told "medical staff the Fibercon was ineffective and requested Metamucil," and on March 9, 2015, he told Dr. Trost the same thing, but his request was refused (Doc. 200, p. 17; Doc. 177-2, p. 12). Then, on June 14, 2015, Barrow indicates in a letter that his rectal bleeding had worsened and he requested diagnostic testing (Doc. 200-1, p. 5). He also complained on December 17, 2015 that he had rectal bleeding and that he wanted to see a doctor (Doc. 177-2, p. 22).

---

[15]  In his affidavit, Barrow states that he informed Dr. Trost that Fibercon was not working, but he does not indicate when (Doc. 200, p. 14).

Barrow's Fibercon was nonetheless continued on January 21, 2016 (Doc. 177-2, p. 23). Dr. Trost does not address his decision to continue Fibercon in light of Barrow's consistent complaints that it did not work effectively. As such, Barrow shall proceed on Count 4 as to Dr. Trost.

E.     **Wexford Health Sources, Inc. (Counts 1-6)**

As articulated by the Seventh Circuit, where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under Section 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for Barrow to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Shields*, 746 F.3d at 796. Put another way, Barrow must show that Wexford's policies, practices, or customs were the "moving force" of the constitutional deprivations that he suffered. *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010); *Monell*, 436 U.S. at 694. Also, a plaintiff pursuing a policy or practice claim must show that policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect the plaintiff. *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

As to Count 1, Barrow's "cost over care" theory is premised on the theory that Wexford places profit over the care of its patients, resulting in the failure to provide

Barrow with constitutionally adequate health care. This theory has appeal. If the evidence reveals Wexford has a policy that its doctors base their medical decisions on cost, and Barrow was rendered unconstitutional medical care as a result, this claim should proceed to trial. If, however, the evidence only reveals that cost played a part in the treatment decisions but that Barrow was afforded medical care consistent with the Eighth Amendment, then this claim should not proceed to trial. Unfortunately for Barrow, he has presented no evidence that cost played anything more than a *de minimis* role in treatment decisions, and he has failed to show that any alleged policy was the moving force behind any of the potentially unconstitutional treatment decisions identified above.

At the outset, Barrow attempts to use the care he personally received to show that Wexford's policies are unconstitutional and were the driving force behind that care. While a jury may find that certain actions or inactions by Dr. Shearing and Dr. Trost exhibit deliberate indifference, "[s]uch isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent" to Barrow's needs. *Shields*, 746 F.3d at 796.

Furthermore, Barrow's belief that he received sub-par medical care does not automatically support a *Monell* "policy or custom" claim. *See Monell*, 436 U.S. at 694. Similarly, reliance on formularies in prescribing medication also is not automatically unconstitutional. *See King v. Kramer*, 680 F.3d 1013, 1020-1021 (7th Cir. 2012). Barrow's further speculation that concern over costs was the driving force behind his potentially

unconstitutional medical care is insufficient to support his claim. *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) (prisoner's speculation regarding motive, in a retaliation context, cannot overcome summary judgment).

While the Court has no doubt that Wexford, a corporation, is interested in reducing costs and increasing profits, Barrow has not connected his theory with any actual evidence that Wexford instituted a policy of placing profits over the health and wellbeing of its patients. Both Dr. Shearing and Dr. Trost averred that their medical decisions were based on medical judgment and not on cost (Doc. 177-1, p. 4; Doc. 177-3, p. 8). Barrow has presented no evidence to refute these statements. Even if a jury were to find that Dr. Shearing and/or Dr. Trost provided unconstitutional care, it does not automatically follow that such care was the result of an unconstitutional policy. The Court also has considered the Wexford Provider Handbook (effective dates July 8, 2015, and June 8, 2012), as well as Wexford's "Pain Management" guidance, GERD medication cost chart and treatment protocol, and Orthopedic Surgery Guidelines. None of the documents contain a formal policy of elevating cost over a physician's medical judgment regarding care. To the extent Barrow claims the medications he was prescribed were cheaper than other medications that were stopped, he has provided no evidence that such medications were, in fact, cheaper for Wexford than other similar medications. And to the extent Barrow asserts he was entitled to surgery or referral to a specialist, there is no evidence that his chronic conditions would have warranted such a referral. Simply put, there is no evidence that cost played any role in Barrow's medical treatment. Thus, Wexford is entitled to summary judgment on Count 1.

Barrow's claims against Wexford in Counts 2 through 6 are redundant of his claim in Count 1 that Wexford had a policy, custom, or practice of elevating "cost over care." He merely re-alleges that Wexford had a cost-cutting policy, which resulted in Dr. Shearing and Dr. Trost's failure to provide constitutionally adequate health care with regard to each of his alleged ailments. And, as noted above, private corporations cannot be held liable under Section 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself; *respondeat superior* does not apply to private corporations under Section 1983. *See Shields*, 746 F.3d at 789. Because Barrow's "cost over care" claim against Wexford is fully articulated in Count 1, his claims against Wexford in Counts 2 through 6 are dismissed.

## CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Defendants Wexford Health Sources, Inc., Dr. Robert Shearing, and Dr. John Trost (Doc. 176) is **GRANTED in part and DENIED in part**. Summary Judgment is **GRANTED** in favor of Wexford and against Plaintiff Ronald Barrow on Count 1 and the claims against Wexford in Counts 2, 3, 4, 5, and 6 are **DISMISSED**. Summary Judgment is **GRANTED** in favor of Dr. Trost and against Plaintiff Ronald Barrow on Counts 3, 5, and 6; Summary Judgment is **DENIED** as to Dr. Trost on Counts 2 and 4. Summary Judgment is **DENIED** as to Dr. Shearing on Counts 2, 3, 4, 5, and 6.

In light of the foregoing, the following claims shall proceed to trial:

Count 2:    Eighth Amendment deliberate indifference to medical needs claim against Defendants Shearing and Trost for denying Plaintiff access to prescription medications;

Count 3:       Eighth Amendment deliberate indifference to medical needs claim against Defendant Shearing for denying Plaintiff adequate treatment for his chronic back injury;

Count 4:       Eighth Amendment deliberate indifference to medical needs claim against Defendants Shearing and Trost for denying Plaintiff adequate treatment for his chronic rectal bleeding and diverticulosis;

Count 5:       Eighth Amendment deliberate indifference to medical needs claim against Defendant Shearing for denying Plaintiff adequate treatment for his chronic knee problem;

Count 6:       Eighth Amendment deliberate indifference to medical needs claim against Defendant Shearing for his shoulder problem.

Magistrate Judge Wilkerson is **DIRECTED** to set a pretrial conference. The Final

Pretrial Conference and Jury Trial dates will be set before the undersigned by separate

order.

**IT IS SO ORDERED.**

**DATED:   March 1, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**